UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TINO PESE,

          Petitioner,

  vs.

D.L. RUNNELS, Warden,

          Respondent.
                                 /

No. C 05-4199 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted based on petitioner's four cognizable claims for relief. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has filed a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

On August 5, 2002, a jury in Alameda County Superior Court convicted petitioner of first degree murder, second degree murder, and unlawful discharge of a firearm. The trial court sentenced petitioner to a term of 73 years to life in state prison. He unsuccessfully appealed his conviction to the California Court of Appeal, and the California Supreme Court denied his petition for review.

//

//

Petitioner does not dispute the following facts, which are excerpted from the opinion

of the California Court of Appeal:

A.    THE ROBBERY

After business hours on April 10, 2001, about 6:30 p.m., an armed robbery took place at the Coaster Company, a wholesale furniture importer and distributor in San Leandro. A large Polynesian man wearing sunglasses and a hooded sweatshirt entered the office and ordered the employees at gunpoint to get under their desks. The man was accompanied by a heavy-set Polynesian woman. Jane Fakava, the office manager at Coaster Company, thought she recognized the woman as Pollyann Taesali, who had previously worked at Coaster Company but had been fired a month earlier. At the time Pollyann Taesali worked there, the keys for the company safe were kept in the top desk drawer of the cashier named Ammabelle.

Without asking, the female robber went straight to what had been Ammabelle's desk, opened the top drawer, and took out one of two keys to the office safe. She then handed the key to Jane Fakava, and the male robber ordered Jane Fakava to open the safe. When Jane Fakava was unable to open the safe with the single key, the male robber fired his gun in her direction. Jane Fakava then got the second key, opened the safe, and turned over two money pouches that contained about $43,000. After the robbers left, she called the police. The police located a spent .40-caliber Smith and Wesson cartridge on the floor and bullet fragments in the wall.

Earlier that same day, about 1:30 p.m., an employee of the Coaster Company saw Pollyann Taesali at the lunch truck outside the office building. He knew Pollyann from her days at the company, and he knew she had been fired. Pollyann was with a large Samoan man, who was sitting in a dark blue Neon. A few days after the robbery, Pollyann called the employee and told him to tell Jane (Fakava) to stop sending the police to her house.

The police pursued Pollyann Taesali as a suspect in the robbery. They went to her parents' home on the night of the robbery, but she was not there. The police later learned Pollyann had been taken into custody on unrelated drug charges and was in the San Leandro jail. After talking with the police, Pollyann was released from custody, only to be arrested a few days later on new, unrelated charges and released again.

Several months before the robbery – around Christmas 2000 – Pollyann Taesali asked her relative, Toaititi Sime (Pone), if he would help her and her friends break into the safe at the company where she worked. Pone Sime declined. Pone Sime had seen Pollyann in the company of appellant, Tino Pese, with whom Sime was acquainted. The pair were together in a blue sports car driven by appellant. A couple of months later, appellant, too asked Sime to help them steal from Pollyann's employer. Sime again refused. Sometime afterward, appellant gave Sime a ride to the East Bay and told Sime that he and Pollyann had "hit" Pollyann's workplace. Appellant mentioned the sum of $40,000.


B.    POLLYANN IN JAIL

2

Pollyann Taesali had chronic problems with drugs and alcohol. She was living with her parents, who were taking care of her two children. In May 2001, Pollyann was back in custody, this time in the San Mateo County jail. She told two fellow inmates that she had stolen a car from a man who owed her money.

Pollyann's cousin, Nicole Saumalu, helped Pollyann make telephone calls from jail. Pollyann called Nicole collect every day. Pollyann would often instruct Nicole to make a conference call to other people, usually to a man named Tino. The number dialed to reach Tino was 415-***-3430. Pollyann also used her friend Hope Molina to make three-way conference calls to Tino at that number.

Pollyann had often mentioned Tino to her cousin Nicole in the months before she was in jail. In custody, Pollyann talked to two other inmates about her boyfriend, Tino. She also told one of the sheriff's deputies about her boyfriend, and the deputy recalled hearing Pollyann on the phone with someone named Tino.

Pollyann exchanged addresses and phone numbers with one of the inmates, Susan Bowen, who was released before Pollyann. Pollyann gave 415-***-3430 as one of her phone numbers.

C. THE MURDER OF POLLYANN

Because the San Mateo County Jail is in an isolated location, the practice of the sheriff's department is to discharge female inmates shortly before midnight on their release date provided that the inmate has money for a cab or someone to give her a ride. Pollyann and Penny Donez were released together about 12:20 a.m. on May 29, 2001. Donez's boyfriend, Michael Perkins, told the jailers he was there to get both women. In fact, Pollyann and Penny Donez had planned a ruse so that Pollyann's boyfriend, Tino, could pick her up without having to come under scrutiny at the jail.[1] However, Tino was not in the parking lot when Pollyann emerged. Penny Donez sent Michael Perkins on ahead without her and accompanied Pollyann back into the jail lobby where Pollyann made a phone call.

A few minutes later, appellant drove up. Pollyann introduced the driver to Penny Donez as Tino. Both women got into his car, and appellant drove to a 7-Eleven store, where Penny said she could be dropped off. At the store, appellant bought two bottles of Old English Malt Liquor and some Newport cigarettes. Penny Donez saw appellant drive off with Pollyann in the car.

Pollyann often wore her hair in a ponytail secured by a red "scrunchy." The scrunchy had been crocheted for Pollyann by another jail inmate, Susan Bowen, who had also given Pollyann a Bible before her own release one day earlier.

About 7:00 a.m., some workers from the Alameda County Public Works Agency found Pollyann's body in a flood station parking lot located in

---

[1]The police investigating the Coaster Company robbery had distributed a flyer to local law enforcement agencies with appellant's photograph.

3

an industrial area near the salt flats by the San Mateo Bridge. Pollyann had been shot once in the back of the head. At the time of her death, Pollyann had a blood alcohol level of .10. Near the body was a small Bible inscribed, "Pollyann from Susan." In her jeans pocket was slip of paper with Susan Bowen's name, address, and phone number. A red scrunchy was in Pollyann's palm, and her left hand was entwined in her hair.

Ballistics experts concluded that the gun fired during the robbery at the Coaster Company was the same gun used to kill Pollyann. The police found a .40-caliber Smith and Wesson bullet casing about three to five feet from where Pollyann's body was discovered. Appellant was living with Guillermo Castillo, who owned a .40-caliber Smith and Wesson VE revolver and appellant borrowed it on occasion. Pone Sime saw appellant with a handgun on the day appellant asked him to help rob Pollyann's workplace.

In April 2001, Guillermo Castillo established a cell phone account for appellant with the number 415-***-3430. Phone records show that appellant's cell phone was in use during the early hours of May 29, 2001. At 12:24 a.m. appellant's phone received a call routed from the Redwood City cell site. At 1:05 and again at 1:30 calls were made from appellant's phone routed from the cell site on Industrial Parkway in Hayward. Around 3:00 a.m. several calls were made to appellant's voice mail, also from Industrial Parkway in Hayward.

(Resp. Ex. D at 1-5.)

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case

4

differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

## DISCUSSION

As grounds for habeas relief petitioner asserts that: (1) the prosecution struck jurors solely on account of their race, a violation of the Equal Protection Clause; (2) his Confrontation Clause rights were violated by admission of hearsay evidence; (3) his Sixth and Fourteenth Amendment rights were violated by the trial court's giving CALJIC 2.03; and (4) the trial court's use of the CALJIC 2.90 definition of "beyond a reasonable doubt" violated due process.

**I.     Jury Selection**

Petitioner claims that the prosecutor used peremptory challenges to strike jurors

solely because they were African-American, in violation of the Equal Protection Clause.[2] The parties do not dispute the California Court of Appeal's description of the relevant trial court proceedings, as follows:

> During jury selection, the prosecutor exercised three of his fourteen peremptory challenges to excuse African-American prospective jurors J.C., H.M., and L.L. Defense counsel peremptorily challenged one African-American juror among fourteen challenges. At the prosecutor's third peremptory challenge of an African-American prospective juror, defense counsel objected, asserting that the African-American jurors were being excluded on account of their race. At that point, one African-American juror remained in the jury box.
>
> Initially, the trial court found that a prima facie case of racial discrimination had been made and that the burden had shifted to the prosecution to show neutral non-race-based reasons for the peremptory challenges. The prosecutor vigorously argued to the contrary that defendant had failed to establish a prima facie case. The trial court acknowledged that good reasons were apparent for the prosecutor's challenges of J.C. and L.L., the first and third of the three African-American jurors removed by the prosecutor. At the same time, the court recognized that the use of a single peremptory challenge based on race would be improper. However, the court was ultimately persuaded by the prosecutor and changed its ruling, finding that defendant had not made a prima facie showing of exclusion of potential jurors based on race.

(Resp. Ex. D at 5.)

A. Equal Protection Standard

The Equal Protection Clause forbids the challenging of potential jurors solely on account of their race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). A party may raise an equal protection claim on behalf of a juror excluded because of the juror's race, regardless of whether the party and the excluded juror share the same race. *Powers v. Ohio*, 499 U.S. 400, 406 (1991). A violation of equal protection under *Batson* is established in a three-step process: (1) the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race (or gender) "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose;" (2) if the prima facie case is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for

---

[2] Although petitioner is Samoan, he may raise an equal protection claim on behalf of jurors excluded because of the jurors' race, regardless of the fact that the jurors and he do not share the same race. See Powers v. Ohio, 499 U.S. 400, 406 (1991).

6

striking the jurors in question; and (3) if the prosecutor carries the burden of showing a race-neutral explanation, the defendant has the burden to prove purposeful discrimination. *Batson*, 476 U.S. at 93-94, 97-98.  A party establishes a prima facie equal protection violation based on race by showing that: (1) the defendant is a member of a cognizable racial group, (2) the group's members have been excluded from the jury, and (3) the circumstances of the case raise an inference that the exclusion was based on race. *Batson*, 476 U.S. at 96.

B.  Standard of Review

Here, petitioner challenged the prosecutor's use of peremptory strikes by way of a motion under *People v. Wheeler*, 22 Cal. 3d 258, 280 (1978).  The trial court denied the motion because it found, relying on *Wheeler*, no prima facie case of racial discrimination. The *Wheeler* motion procedure used by California courts does not satisfy the constitutional requirement laid down for the first step of *Batson*, however.  *Johnson v. California*, 545 U.S. 162, 168 (2005); *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000).  Since August 3, 1984, California courts have imposed the more stringent requirement that the defendant "show a strong likelihood," *Wheeler*, 22 Cal. 3d at 280, rather than merely "raise an inference," *Batson*, 476 U.S. at 96, that the prosecutor had excluded venire members from the petit jury on account of their race.  *Wade*, 202 F.3d at 1196-97. Because California courts using the *Wheeler* procedure have not applied federal law as clearly established by the United States Supreme Court, a federal habeas court need not defer to the California court's findings as it would otherwise be required to do under 28 U.S.C. § 2254(d). *Wade*, 202 F.3d at 1197.

In *People v. Johnson*, 30 Cal. 4th 1302 (2003), the California Supreme Court attempted to rectify the situation by concluding that "*Wheeler's* terms 'strong likelihood' and 'reasonable inference' state the same standard" – one that is entirely consistent with *Batson*.  30 Cal. 4th at 1313.  *Batson*, the state high court held, "permits a court to require the objector to present, not merely 'some evidence' permitting the inference, but 'strong

7

evidence' that makes discriminatory intent *more likely than not* if the challenges are not explained." *Id.* at 1316.  The Supreme Court of the United States disagreed, and made clear that "California's 'more likely than not' standard is at odds with the prima facie inquiry mandated by *Batson.*" *Johnson v. California*, 545 U.S. at 171-72.  To satisfy *Batson's* first step, a defendant need not persuade the judge that the challenge was more likely than not the product of purposeful discrimination; rather, he need only produce evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.  *Id.* at 171.  Accordingly, federal habeas courts should continue to apply *Wade's* de novo review requirement whenever state courts use the "strong likelihood"/"more likely than not" standard, as these courts are applying a lower standard of scrutiny to peremptory strikes than the federal constitution permits.  *Accord Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004) (applying de novo review where state court applied "strong likelihood" standard); *Cooperwood v. Cambra*, 245 F.3d 1042, 1047 (9th Cir. 2001) (applying de novo review where state court applied "strong likelihood" standard).

   Here, the California Court of Appeal upheld the trial court's finding that petitioner had not established a prima facie case of racial discrimination by the prosecutor.  The appellate court's decision was announced after the United States Supreme Court had granted a petition for a writ of certiorari, but before it had announced its decision in *United States v. Johnson*.  (Resp. Ex. D at 6-7.)  Concluding that it was bound by the California Supreme Court's decision in *People v. Johnson* despite the grant of certiorari, the California Court of Appeal applied California's  "strong likelihood"/"more likely than not" standard in finding that petitioner had not made a prima facie case of discrimination under *Batson*.  (*Id.*)  As that is the wrong standard, pursuant to *Wade*, this court will review de novo the California Court of Appeal's finding of no prima facie case of discrimination.

  C.  Analysis

   Here, the first and second elements of the *Batson* prima facie case of discrimination are met because the prospective jurors are African-American and the prosecutor used

peremptory strikes to remove them.  *See Batson*, 476 U.S. at 96.  The issue is whether the third element is met, namely whether the circumstances of the case raise an inference that the challenges were based on race.  *See id.*

In *Batson*, the Supreme Court noted that, in "deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances," and noted that a "prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006) (quoting *Batson*, 476 U.S. at 96-97).  The Supreme Court reiterated in *Johnson* that "a defendant may rely on 'any other relevant circumstances' to raise an inference of discriminatory purpose."   *Id.* (quoting *Johnson*, 545 U.S. at 170).

A principal way that a court considers a petitioner's *Batson* claim in light of the "totality of the relevant facts" is by looking at percentages.  *Boyd*, 467 F.3d at 1147 (quoting *Batson*, 476 U.S. at 94).  The Ninth Circuit has held that, "[t]o establish a prima facie case, [a petitioner does] not need to show that the prosecution ha[s] engaged in a pattern of discriminatory strikes against more than one prospective juror" because "the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Id.* Nonetheless, it is helpful to compare the number of minority prospective jurors stricken to non-minority prospective jurors stricken.  *Id.* (citing *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (noting "remarkable" number of prosecutor's strikes of minority prospective jurors). The prosecutor struck eleven prospective jurors who were not African-American and three who were, and the prosecutor only struck three out of the five prospective African-American jurors – one African-American remained on the jury, and defense counsel struck one of them.  As a relatively low percentage of the prosecutor's strikes were against African-American prospective jurors, and the prosecutor did not strike all of the prospective African-American prospective jurors, there was no statistical disparity or pattern of discrimination in the striking of African-American prospective jurors in this case.  *Compare, e.g., Johnson*,

545 U.S. at 162-63, 172-73 (prima facie case of discrimination found where prosecutor removed all three prospective back jurors, resulting in an all-white jury); *Williams*, 432 F.3d at 1109 (prosecutor's use of three of his first four peremptory challenges to dismiss African-American jurors enough to establish prima facie inference of racial discrimination).

      To be sure, even where the prosecutor has not attempted to remove all members of a minority, a pattern of exclusion of minority venirepersons may still provide sufficient support for an inference of discrimination. *See Paulino v. Castro*, 371 F.3d 1083, 1090-91 (9th Cir. 2004) (prima facie case established where five of six possible black jurors stricken). Nevertheless, there are other surrounding circumstances in this case that indicate there was no pattern of discrimination. To begin with, the state courts found that for two out of the three African-Americans struck by the prosecutor, the record contained race-neutral reasons that they might not be good jurors. One, juror J.C., had a brother-in-law who was a criminal defense attorney, had a son in prison whom she believed had been unfairly treated by the criminal justice system, believed that minorities are presumed guilty, and believed that the police had not properly responded to her complaints. (Resp. Ex. F, Augmented Reporter's Transcript ("ART"), Vol. 3, at 157-58, 159-61, 166; Resp. Ex. D. at 7-8 n.3.) Another, juror L.L., did not believe the criminal justice system treats all races equally, responded to whether he and suffered discrimination by writing "I'm 6'2" and black, you figure it out," and had previously served on a jury that had hung. (*Id.*) In addition, race and race discrimination were not at issue in this case, and the stricken prospective jurors were not of the same race (Samoan) as the prospective jurors. These factors also weigh against the finding of an inference of discrimination in this case. *Cf. Johnson v. Campbell*, 92 F.3d 951, 953-54 (9th Cir. 1996) (insufficient prima facie case for exclusion based on sexual orientation where neither sexual orientation nor other discrimination was at issue in case and there were neutral reasons for challenge).

      Finally, in assessing "all relevant circumstances" surrounding challenged peremptory strikes, for purposes of determining whether there is an inference of discrimination under

10

*Batson*, "Supreme Court precedent requires a comparative juror analysis." *Boyd*, 467 F.3d at 1149-50 (citing *Miller-El v. Dretke*, 125 S.Ct. 2317, 2325-38 & 2326 n.2 (2005)); *see also Kesser*, 465 F.3d at 360. Comparative juror analysis involves determining whether non-challenged jurors possess any of the characteristics on which the prosecution challenged jurors in the protected group. *Snyder v. Louisiana*, 128 S. Ct. 1203, 1212 (2008); *Boyd*, 467 F.3d at 1150. Contrary to the view of the California courts, comparative juror analysis should take place on appeal even when the trial court did not engage in such analysis.[3] *Id.* at 1148-50.

      Petitioner concedes in his petition that there were race-neutral reasons for striking juror J.C., but contends that a comparative analysis of stricken jurors L.L. and H.M. with the jurors who were not stricken raises an inference of discrimination. (Brief attached to Petition at 17 & n.8.[4]) The record does not support this contention, however, as it reveals unique qualities of L.L's and H.M's answers to the jury questionnaires and voir dire that provide race-neutral reasons for striking them. L.L was the only prospective juror whose responses to voir dire and the jury questionnaire revealed that he had previously served on a hung jury (ART Vol. 4 at 97), did not believe the criminal justice system treats all races equally, particularly with respect to the imposition of the three strikes rule (Augmented Clerk's Transcript ("ACT") at 1034, ART Vol. 4 at 98), and responded to whether he had suffered discrimination by writing "I'm 6'2" and black, you figure it out" (ACT at 1034). With respect to H.M., unlike any of the jurors, she disagreed in her questionnaire with the principle that a defendant does not have to testify, stating that if a defendant has evidence of his innocence he should be required to present it. (ACT at 640-41.) She was also

---

[3] On this point, the Ninth Circuit in *Boyd* amended its earlier opinion which had held to the contrary. *Boyd*, 467 F.3d at 1144 (citing *Boyd v. Newland*, 393 F.3d 1008,1013 (9th Cir. 2004)). In this case, the California Court of Appeal did not conduct a comparative juror analysis because the trial court had not done so in the first instance. (Resp. Ex. D at 8-10.)

[4] Petitioner attaches, and incorporates in full, his opening brief on appeal to the California Court of Appeal.

11

younger, at age 24, than any of the other prospective jurors.[5]  (ACT at 634; Brief Attached to Petition at 20-23.)

While other prospective jurors who were not struck had expressed that the criminal justice system does not treat people of different races equally, and had experienced discrimination, no jurors had previously served on a jury that hung, and none had answered the question about discrimination in as confrontational a manner as L.L.'s "you figure it out" answer.  Although these distinctive aspects of L.L.'s answers are not conclusive that he would not have been a good juror, the court is mindful that at the voir dire stage lawyers are only making their best guess at how a prospective juror may act on the jury, and L.L's answers certainly provide a race-neutral suspicion that L.L. had a potential to be disruptive, confrontational or hostile on the jury.  Similarly, no jurors other than H.M. had disagreed with the proposition that a defendant did not have to testify, and she also had a unique combination of youth and a lesser degree of education.  These qualities provide a race-neutral suspicion that there was a risk H.M. would not properly apply or understand the legal concepts in the jury charge.  As a result, a comparative juror analysis does not raise an inference of discrimination in this case.

In sum, the record in this case does not create an inference of discrimination in the prosecutor's peremptory challenges to three African-American prospective jurors.  The prosecutor also struck eleven prospective jurors who were not African-American, he did not strike all of the African-American venirepersons, the state courts found race-neutral reasons for striking two out of the three African-American prospective jurors, this was not a case that involved race or race discrimination, the defendant and victim were of a different race than the struck prospective jurors, and a comparative juror analysis does not raise an inference of discrimination.  As a result, petitioner has not established a prima facie case of discrimination under the first step of the *Batson* analysis, and petitioner is not entitled to

---

[5]The only juror close to her in age, at 26, had a college degree, whereas H.M. had not been to college.  (ACT at 286-300.)

12

habeas relief on this claim.

## II.     Confrontation Clause

Petitioner claims that testimony by various witnesses as to statements by the victim, Pollyann Taesali, violated his rights under the Confrontation Clause. (Brief attached to Petition at 40-41, 53.)[6] Prior to trial, the trial court granted petitioner's motion to exclude statements by Pollyann to the police during the robbery investigation, as well as various other statements that she made to or were overheard by other witnesses. However, the court found a limited number of her statements to be admissible as non-hearsay or under hearsay exceptions.

Petitioner complains about the admission of statements made by Pollyann to five different witnesses, as follows:

### 1.     Nicole Saumalu

Pollyann's cousin, Nicole Saumalu, testified that when she visited Pollyann in jail, Pollyann stated that wanted to "get some of her money" from petitioner, that she had "gotten over" on her old job, that petitioner is "too busy kissing my ass because I have evidence against him," and that she was going to "take care of her money issues with him." (RT at 691-93, 697-700.) She also testified that she overheard Pollyann on the telephone tell petitioner "not to spend all of the money," that she would tell her mother to stop gossiping about her doing the robbery, and that she had petitioner's "back" and would not turn against him. (RT at 702, 70-05.)

### 2.     Penny Donez

Penny Donez testified that she was an inmate in jail with Pollyann, and Pollyann spoke about a robbery she had committed at the place she used to work, and about her

---

[6] Petitioner spends the majority of this claim arguing that such testimony was inadmissible under the California Evidence Code, and only mentions the Confrontation Clause in passing. (Brief attached to Petition at 37-54.) The California Court of Appeal found the evidence admissible under state law, and that its admission was, in any event, harmless, and did not address the Confrontation Clause. This court does not address the admissibility of the statements under state law because federal habeas relief is not available for a violation of state law.

13

boyfriend, Tino. (RT at 1026.)[7]

### 3. Iofi Taesali, Jr.

Iofi Taesali, Jr., Pollyann's brother, testified that before Pollyann went to jail, she "kind of blurted out that Tino jacked her." (RT at 1221.)

### 4. Hope Molina

Hope Molina, a friend of Pollyann's, helped Pollyann make a telephone call from jail and overheard Pollyann leave a voicemail for "Tito" or "Tino" saying "Babe, I love you. Don't do me like that. Come bail me out of jail. You got my money." (RT at 1277.) Molina testified that Pollyann told her that her boyfriend had about $40,000 of their money. (RT at 1282.)

### 5. Lemasino Taesali

Lemasino Taesali, Pollyann's sister, testified that before she died, Pollyann told her that she was angry with petitioner because he owed her some money. (RT at 1429, 1431.)

"The ultimate goal of the Confrontation Clause is to ensure reliability of evidence . . . not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Crawford v. Washington*, 541 U.S. 36, 61 (2004). The Confrontation Clause prohibits all out-of-court "testimonial" statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." *Id.* at 51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* While the Supreme Court has not articulated a comprehensive definition of testimonial hearsay, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68.

The statements that petitioner complains about were not "testimonial" under

---

[7]She also testifed, unprompted, that Pollyann "started telling me about what her and her boyfriend did." (RT at 1024.) However, this statement was not admitted into evidence: the trial court granted defense counsel's objection, ordered the testimony stricken, and admonished the jury not to consider it. (*Id.*)

14

*Crawford*. They were not sworn or solemn declarations made during prior testimony, at a preliminary hearing, before a grand jury, at a former trial or to the police. Nor were they made to any government official or in connection with any government proceeding or investigation. Rather, they were remarks Pollyann made in the course of ordinary conversations with her family members and friends.[8] *See United States v. Manfre*, 368 F.3d 832, 838 (8th Cir. 2004) (statements made to family members not "testimonial" under *Crawford*). Petitioner has pointed to no authority, nor is the court aware of any, suggesting that casual remarks to acquaintances are "testimonial" for purposes of the Confrontation Clause under *Crawford*. Indeed, *Crawford* suggests to the contrary. *See Crawford* at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.")

In any event, where, as here, the Supreme Court has never squarely addressed whether a particular type of statement is testimonial, a state court's admission of such statement at trial is not "contrary to" clearly established Supreme Court precedent or an "unreasonable application" of *Crawford*, under 28 U.S.C. § 2254(d)(1). *Moses v. Payne*, 543 F.3d 1090, 1099-1100 (9th Cir. 2008) (finding state court's admission of victim's out-of-court statements to emergency room physician as non-testimonial statements not contrary to clearly established federal law or unreasonable application thereof, because Supreme Court had never "squarely addressed" whether statements made to doctors for purposes of medical treatment and diagnosis were testimonial).

In sum, the admission of Pollyann's non-testimonial statements to her family and friends did not violate petitioner's rights under the Confrontation Clause, and petitioner is not entitled to habeas relief on this claim.[9]

---

[8] There was no evidence that the inmates to whom she made some of these remarks in jail were working for the police or were confidential informants.

[9] Petitioner makes one conclusory reference to due process in this claim, stating without any explanation or elaboration that the admission of Pollyann's statements "lightened the prosecution's burden of proof." (Brief attached to Petition at 53.) The court finds no connection between the admission of these statements and the prosecution's

15

1 **III.     CALJIC No. 2.03**

2      Petitioner claims that the use of a jury instruction on consciousness of guilt, pursuant
3 to CALJIC No. 2.03, violated his constitutional right to a jury and to due process. CALJIC
4 No. 2.03 reads as follows:

> If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, ad its weight and significance, if any, are for you to decide.

(Resp. Ex. D at 13 n. 9.)

     Petitioner argues that this instruction is improper because it is a "pinpoint" instruction, meaning that it directed the jury to specific evidence favorable to the prosecution. Petitioner points to no authority from the United States Supreme Court, however, and this court is not aware of any, that prohibits the use of "pinpoint" instructions.[10] In the absence of "clearly established" controlling Supreme Court precedent, there is no basis for granting federal habeas relief based solely on the fact that a so-called "pinpoint" instruction was used. *See* 28 U.S.C. § 2254(d)(1).

     To be sure, federal habeas relief is available when an a jury instruction so infects the trial that the trial is rendered fundamentally unfair, in violation of petitioner's right to due process. *Estelle v. McGuire*, 502 U.S. 62, (1991). The instruction here, however, was not improper. It simply stated the common-sense proposition that any "willfully false or deliberately misleading" statement by petitioner "may" be considered as evincing consciousness of guilt. Contrary to petitioner's argument, the instruction did not single out

---

burden of proof. Moreover, as explained by the California Court of Appeal, the admission of this evidence was harmless because the trial court gave clear instructions limiting the evidence to its proper purposes, and there was ample other evidence showing petitioner's involvement in the robbery and Pollyann's plan to meet petitioner after getting out of jail in order to get money that she believed he owed her. (Resp. Ex. D at 11-13.)

[10]Petitioner only cites from the California Supreme Court (Brief attached to Petition at 55-58), which, as explained by the California Court of Appeal, has repeatedly rejected petitioner's argument (Resp. Ex. D at 13-14 (citing cases).)

16

any particular piece of evidence or point to any statement by petitioner as tending to demonstrate guilt. The instruction did not require the jury to find *any* statement by petitioner to be false at all, and if the jury did find a false statement, the instruction simply allowed, but did not require, the jury to find that it evinced a consciousness of guilt. Moreover, there was ample evidence in this case to support giving an instruction about consciousness of guilt. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982) (due process allows an instruction if the evidence supports it). As explained by the California Court of Appeal, during petitioner's interview with the police, he denied having a cell phone, dating Pollyann Taesali, ever speaking to her on the phone, picking her up from the jail, or knowing she was in jail. (Resp. Ex. D at 13.) The jury could reasonably view these statements as "willfully false or deliberately misleading" in light of the evidence that petitioner and Pollyann were in a romantic relationship and petitioner had picked her up from jail when she was released, and the cell phone records of calls between them. Consequently, the consciousness of guilt instruction in this case did not violate petitioner's right to due process or his right to a jury trial, and petitioner is not entitled to habeas relief on this claim.

**IV.   CALJIC No. 2.90**

Petitioner claims that California's jury instruction regarding reasonable doubt, CALJIC No. 2.90, violates the Due Process Clause by lowering the prosecutions' burden of proof. As petitioner acknowledges (Brief attached to Petition at 59), the Ninth Circuit has rejected this claim. *See Lisenbee v. Henry*,166 F.3d 997, 999-1000 (9th Cir. 1999) (use of term "abiding conviction" in defining reasonable doubt in CALJIC No. 2.90 is constitutionally sound). Accordingly, petitioner is not entitled to habeas relief on this claim.

//
//
//
//

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: January 29, 2009.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.05\PESE199.DENY.wpd